# CONTINUATION IN SUPPORT OF
# AN APPLICATION FOR A SEARCH WARRANT

I, Joseph Palmer, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION

1. I submit this continuation in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of a digital device currently in law enforcement possession and described more fully in Attachment A, and the extraction from that property of electronically stored information as described in Attachment B.

2. To summarize, James PECHO has violated 18 U.S.C. § 2250 – Failure to Register as a Sex Offender. He was charged with this offense in the Western District of Michigan on January 15, 2025. During the arrest operation, three firearms were located inside PECHO's residence. Under federal law PECHO is prohibited from possession firearms and ammunition. I submit that the matters set forth in this affidavit demonstrate probable cause to believe that evidence of violations of federal law, specifically James PECHO's residency and activities in Michigan (hereinafter the "Subject Offense"), and his possession of firearms, will be found on the Samsung Android cellular device, MSN R5CN70ZXMSB (hereinafter the "Subject Device"), described in Attachment A. There is probable cause to search the information in Attachment A for property (defined in Fed. R. Crim. P. 41(a)(2)(A) as including information), and evidence of these crimes as described more fully in Attachment B.

## AGENT BACKGROUND

3. I am a Deputy with the United States Marshals Service in the Western District of Michigan and have been so employed as a Deputy U.S. Marshal since March 2010. As part of

my regular assigned duties, I conduct investigations regarding the whereabouts of Federal and State Fugitives, most of which are violent offenders with extensive criminal histories. I am a commissioned federal law enforcement officer of the United States Marshals Service, currently assigned to the United States Marshals Service Fugitive Task Force in Grand Rapids, MI. Deputy United States Marshals are empowered under Title 28 U.S.C. §§ 564 & 566 to carry firearms, execute state and federal warrants, make arrests for offenses against the United States of America and to perform other law enforcement duties as authorized by law.

4. The purpose of a United States Marshals Service Fugitive Task Force is to combine the efforts of federal, state, and local law enforcement agencies to locate and apprehend dangerous fugitives and assist in high profile investigations.

5. Through my employment as a Deputy U.S. Marshal, my duties have included the following: task force operations with U.S. Marshals Service, task force operations with the DEA, fugitive apprehension, sex offender compliance investigations, investigations into violations of the Court's orders, court operations, prisoner production, prisoner processing, and the maintenance of prisoner records.

6. From March 2010 through July 2010, I attended the United States Marshals Training program at the Federal Law Enforcement Training Center (FLETC) in Glynco, Georgia. While at FLETC, I completed the Marshals Pre-Basic Program, the Criminal Investigator Training Program (CITP), and the United States Marshals Basic Training Course. Those courses entailed investigative matters including, but not limited to, fugitive apprehension and investigations into non-compliant sex offenders.

7.   For the past two years, I have been assigned to the USMS Western District of Michigan, where I serve as the district liaison to the USMS Sex Offender Investigations Branch. As part of my duties, I investigate crimes involving non-compliant and absconded sex offenders, including those who may have violated 18 U.S.C. § 2250.

8.   I have interviewed hundreds of associates, witnesses, and suspects. I am familiar with the manner in which crimes are committed and how suspects attempt to avoid prosecution. I have conducted and been a part of numerous narcotics, sex offender, and fugitive related surveillance operations and have authored and served search and arrest warrants for several cases.

9.   The facts in this continuation come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This continuation is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

## IDENTIFICATION OF THE DEVICE TO BE EXAMINED

10. The property to be searched is a black Samsung Android cellular device, MSN R5CN70ZXMSB cellular phone, IMEI 356338110376518, hereinafter the "Subject Device."

11. Law enforcement seized the Subject Device on January 15, 2025, in the city of Kalamazoo, MI.

12. The Device is currently located at the Grand Rapids Police Department, in an evidence storage locker.

13. The applied-for warrant would authorize the forensic examination of the Subject Device for the purpose of identifying electronically stored data particularly described in Attachment B.

## PROBABLE CAUSE

14. On July 12, 2024, I received information and documentation from the U.S. Marshals Service (USMS) District of Arizona regarding registered sex offender James PECHO.

15. Specifically, the USMS District of Arizona requested the assistance of the USMS Western District of Michigan in locating and apprehending PECHO on outstanding arrest warrants from Maricopa County, AZ. That fugitive case was assigned to me.

16. In additional to the fugitive investigation, I also opened a federal criminal investigation into possible violations of 18 U.S.C. § 2250 – Failure to Register as a Sex Offender.

17. During my investigation, I learned that, on July 10, 1982, PECHO was convicted of Sexual Assault, in violation of ARS 13-1406, in the Superior Court of the State of Arizona, Navajo County, court case C-82-0604-0605. The court documents detail that PECHO entered the home of the victim through a bathroom window and sexually assaulted her while threatening her 8-year-old daughter. Based on this conviction, PECHO is a Tier III offender under the Sex Offender Registration and Notification Act (SORNA) and is required to register as a sex offender for the duration of his life.

18. In September 2012, PECHO was convicted in the Superior Court of Arizona, Maricopa County, of Failure to Register as a Sex Offender, a Class 4 Felony Offense, in court case CR2012-006766-001 DT. PECHO was placed on Adult Probation with Maricopa County for lifetime.

19. On March 31, 2021, Maricopa County Adult Probation violated PECHO for multiple infractions, including using unauthorized electronic devices and searching for rape pornography, rough pornography, "how to rape women" and gang rape pornography along with dating and escort websites. PECHO admitted to viewing and masturbating to these videos and admitted to speaking with women online with minor children. A warrant was issued for his arrest on this date for the violations after PECHO failed to report to probation as directed.

20. On May 2, 2023, Officer R. Russell from the Mesa Police Department went to PECHO's last registered address at 1459 W 7th Street, Mesa, AZ, to conduct a sex offender compliance check. He spoke with an adult female who stated that PECHO had not lived at that address for years.

21. On August 11, 2023, a warrant was issued for PECHO's arrest in the Maricopa County Superior Court, for Failure to Register as a Sex Offender.

22. PECHO currently drives a black Ford F-150, which is registered to him in the state of Michigan and has a valid Michigan license plate. The registration address on that vehicle is listed as 1459 W 7th Street, Mesa, AZ. However, that vehicle has been routinely captured on license plate reader cameras in Southwest Michigan.

23. During my investigation, on August 7, 2024, I received information from Michigan DHHS that PECHO was employed in Q1 2024 at Flemington Instruments and was reporting employment in Q2 2024 at Conti Electric Inc, which is a Michigan-based company.

24. On November 13, 2024, at my request, Deputy U.S. Marshal (DUSM) Vanessa Siemasz in the Eastern District of Michigan conducted an interview at Conti LLC at 6417 Center Dr, Sterling Heights, MI 48312 regarding PECHO's employment.

25. During the interview, DUSM Siemasz learned that PECHO was an employee at Conti LLC, but had since left the company. DUSM Siemasz was able to get a photocopy of his employment file, which she sent to me.

26. In that file, PECHO listed his address as PO Box 421 Oshtemo, MI 49077 on his direct deposit form, his DHS Employment Eligibility Verification form and his Conti LLC new hire information form. However, on a different Conti LLC form he listed his address as PO Box 402, Oshtemo, MI 49077. The employment forms indicate that PECHO is an electrician by trade.

27. The ID PECHO had on file is his AZ identification card, which lists his address as 1459 W 7th St, Mesa, AZ 85201. He also listed his phone number as 928-242-7419.

28. Also at my request, Michigan State Police (MSP) Detective Cox, who is a Task Force Officer with the USMS Fugitive Task Force, conducted a search of their database and located a prior contact with PECHO back in August 2021, Report # 51-3481-21. During that incident, an MSP Trooper was dispatched to a hotel in Kalamazoo, MI, which was predicated by a call from the hotel staff, to interview PECHO because he was taking pictures in public places and making the hotel staff uncomfortable. At that time, PECHO stated that he was an out-of-state electrician and provided a phone number of 928-242-7419.

29. A check of a commercial online database shows that the phone number 928-242-7419 is a Verizon Wireless device.

30. Law enforcement agents with the United States Postal Inspection Service (USPIS) told me that US Postal records indicate PO BOX 402 is assigned to James PECHO, with a physical address of 1944 S 11th Street, Kalamazoo, MI.

31. During the late evening of November 13, 2024, Kalamazoo County Sheriff's Officers, at the request of USMS investigators, checked the parking lot of 1944 S 11th Street, Kalamazoo, MI, and located PECHO's truck backed into a numbered car stall.

32. Additionally, during my investigation, I learned that a Personal Protection Order was served on PECHO in October 2024 by the Kalamazoo County Sheriff's Office. The Proof of Service has his addresses listed as 1842 S 11th Street, Apt 1944 – 3D, Kalamazoo, MI 49009. It shows that it was served in person on October 27, 2024.

33. I obtained the Petion for the Personal Protection Order from the 9th Circuit Court Family Division. That document, which was written by a woman who was previously in a

relationship with PECHO, states, in part, "I know he is a felon and is not supposed to be around firearms but he has told me and a friend of mine that he has one."

34. On January 15, 2025, a federal arrest warrant was issued by United States District Judge Phillip Green, for James PECHO, alleging violations of 18 U.S.C. § 2250 – Failure to Register as a Sex Offender, Case No 1:25-cr-2.

35. On January 16, 2025, USMS investigators established surveillance at 1842 S 11th Street, Apt 1944-3D, Kalamazoo MI, to apprehend PECHO. His truck was observed backed into a covered car port outside of his apartment building.

36. At approximately 12:30PM, I interviewed the apartment manager and one of her employees at the on-site management office. They stated that they knew PECHO, confirmed his apartment, and provided me with a copy of his lease. They also stated that he came in to re-sign his lease within the past two weeks. Unsolicited, the apartment manager stated, "Be careful, he carries all the time." When pressed, she stated that he always carries a firearm and that she recently saw him in the parking lot and the gun was "on his hip." Her assistant, who was present when PECHO signed his new lease, stated that he was bragging about his "new toy" and showed her pictures on his phone of a handgun. She stated that she believes he keeps it in his car but couldn't elaborate on why she thought that.

37. At approximately 2:30PM, PECHO was observed exiting the apartment building and was taken into custody without incident. USMS personnel conducted a pat-down search of PECHO and located the Subject Device in his pants pocket.

38. Following his arrest, ATF Special Agent Jeremy Marshall and I conducted an interview with PECHO. That interview occurred in SA Marshall's vehicle, and SA Marshall recorded the interview with his body worn camera.

39. I began the interview by reading PECHO his Miranda Rights, as stated on the USMS form USM-99. PECHO waived those rights and agreed to speak with us.

40. During questioning, I asked him if he was in possession of a firearm. He told me that he had three firearms in his apartment. When asked, he stated that he had a Desert Eagle .357 caliber handgun, a .40 caliber handgun, and a .45 caliber handgun. He also stated that they were all loaded. He voluntarily signed an ATF consent form, allowing us to search his vehicle and his residence.

41. During the search of PECHO's residence, three handguns were located: a Desert Eagle .357 caliber handgun, which had a loaded magazine inserted but no round in the chamber, a .40 caliber handgun, which also had a loaded magazine inserted but no round in the chamber, and a .45 caliber handgun, loaded with a round in the chamber, on the dresser in his bedroom.

42. In summary, I believe that James PECHO, who is a registered sex offender and a fugitive from the state of Arizona, has been residing in Kalamazoo, MI, and has not registered as a sex offender in Michigan, in accordance with state and federal law. Additionally, I believe that PECHO, who is a prohibited person due to his prior felony convictions, was in possession of three handguns, also in violation of federal law. Lastly, at the time of arrest, PECHO was found to be in possession of the Subject Device, which likely contains evidence of federal crimes, both charged and uncharged.

43. The Subject Device, which was seized on January 16, 2025, is currently in the custody of the Grand Rapids Police Department. In my training and experience, I know that the Subject Device has been stored in a manner in which its contents are, to the extent material to this investigation, in substantially the same state as they were when the Subject Device first came into the possession of the USMS.

## TECHNICAL TERMS

44. Based on my training and experience, I use the following technical terms to convey the following meanings:

   a. Wireless telephone: A wireless telephone ( or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files ; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also

include global positioning system ("GPS") technology for detem1ining the location of the device.

b. Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film . Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

c. GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to

        that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

    d. Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

45. Based on my training, experience, and research, and from consulting the manufacturer's advertisements and product technical specifications available online, I know that the Device has capabilities that allow it to serve as a wireless telephone, digital camera, GPS navigation device, and internet access device. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

46. As PECHO was previously convicted of sexual assault, has repeatedly violated his probation, and has previously been convicted of failing to update his sex offender registration, and obstructed law enforcement by improperly moving to another state without properly registering, all while using a cellular phone, I believe there to be evidence of PECHO's movement contained within the GPS data of the phone, as well as information about his location contained within text messages, photographs, videos, other messaging communication applications, travel applications (i.e. hotel and flight applications), payment information, websites visited and searched, and Wi-Fi and hotspot connections made.

47. The Subject Device's ability to store images in digital form makes the phone itself an ideal repository for this information. Electronic storage media can store thousands of images or videos at very high resolution. It is extremely easy for an individual to take a photo or a video with a camera-bearing smartphone.

48. A growing phenomenon related to smartphones and other mobile computing devices is the use of mobile applications, also referred to as "apps." Apps consist of software downloaded onto mobile devices that enable users to perform a variety of tasks - such as engaging in online chat, sharing digital files, reading a book, or playing a game - on a mobile device. Individuals commonly use such apps to access information about their location and share their location. Some apps allow users to "check in" when they arrive at a particular location creating a record of their whereabouts.

49. As is the case with most digital technology, communications by way of cellular phone can be saved or stored on the Device. Storing this information can be intentional (i.e., by saving an email as a file on the device or saving the location of one's favorite websites in, for example, "bookmarked" files) or unintentional. Digital information, such as the traces of the path of an electronic communication, may also be automatically stored in many places (e.g., temporary files or ISP client software, among others). In addition to electronic communications, cellular phone user's Internet activities generally leave traces or "footprints" in the web cache and history files of the browser used including of where a person may have been at a particular time. Such information is often maintained indefinitely until overwritten by other data.

**ELECTRONIC STORAGE AND FORENSIC ANALYSIS**

50. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

51. *Forensic evidence:* As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the Device was used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on the Device because:

    a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords.

    b. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

    c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw

        conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

    d. The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

    e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

52. *Nature of examination:* Based on the foregoing, and consistent with Rule 4l(e)(2)(B), the warrant I am applying for would permit the examination of the Subject Device consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

53. *Manner of execution:* Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve

the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

54. Additionally, as a partner agency on the United States Marshals Service Fugitive Task Force, and as the current custodian of the Subject Device, I request that the Grand Rapids Police Department be authorized to conduct the examination on behalf of the United States Marshals Service and the Bureau of Alcohol, Tobacco, Firearms, and Explosives.

## AUTHORIZATION REQUEST

Based on the foregoing, I submit that this continuation supports probable cause for a search warrant authorizing the examination of the Subject Device described in Attachment A to seek the items described in Attachment B.